NO. 13-1030

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

**AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA LEGAL FOUNDATION, INCORPORATED; DEAN DEBNAM; CHRISTOPHER HEANEY; SUSAN HOLLIDAY, CNM, MSN; MARIA MAGHER**

*Plaintiffs-Appellees,*

v.

**ANTHONY J. TATA, in his official capacity as Secretary of the North Carolina Department of Transportation; JAMES L. FORTE, in his official capacity as Commissioner of the North Carolina Division of Motor Vehicles,**

*Defendants-Appellants.*

_____

Appeal from the United States District Court
for the Eastern District of North Carolina
Western Division

_____

**BRIEF FOR PLAINTIFFS-APPELLEES**
_____

**Christopher A. Brook**
**AMERICAN CIVIL LIBERTIES**
 **UNION OF NORTH CAROLINA**
 **LEGAL FOUNDATION, INCORPORATED**
**Post Office Box 28004**
**Raleigh, North Carolina 27611**
**(919) 834-3466**
*Counsel  for Plaintiffs-Appellees*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES……...............................................................v

STATEMENT OF THE ISSUES…………………………………..................1

STATEMENT OF THE FACTS…………………………………..................1

SUMMARY OF THE ARGUMENT…………………………………………4

STANDARD OF REVIEW…………………………………………………...6

ARGUMENT………………………………………………………………….6

    I.      THE DISTRICT COURT PROPERLY GRANTED SUMMARY
            JUDGMENT IN FAVOR OF THE PLAINTIFFS GIVEN THAT
            THE GOVERNMENT ALLOWED ONLY ONE SIDE OF THE
            ABORTION DEBATE TO SPEAK THROUGH THE NORTH
            CAROLINA SPECIALTY LICENSE PLATE FORUM…………….6

            A.    The District Court correctly concluded this Court's four-
                   factor test demonstrates that "Choose Life" specialty
                   license plates implicate private speech such that North
                   Carolina cannot engage in viewpoint discrimination
                   by refusing to offer a countervailing alternative………………6

                 1.  The "central purpose" of the North Carolina license plate
                     program is to allow for the private expression of various
                     special interests as well as to raise revenue for the State…..9

                 2.  The government exercises editorial control over the
                     "Choose Life" license plates………………………………12

                 3.  The close connection between the "Choose Life" license
                     plate message and the vehicle owner who chooses to
                     display it on his or her car indicates the vehicle owner is
                     the literal speaker behind this message……………………12

                 4.  The means through which a vehicle owner obtains the
                       "Choose Life" license plate for his or her car indicates

the vehicle owner is ultimately responsible for this
message…………………………………………………14

B.    The District Court correctly concluded this Court's durable
and oft-employed four-factor government speech test was
not overruled in *Page* and still governs the current
controversy…………………………………………………...16

C.    The District Court correctly concluded *Johanns* and
*Summum* did not invalidate the *SCV* factors by creating
a one-factor, across-the-board control test for government
speech…………………………………………………...21

1. The government speech doctrine prior to *Johanns* was a
context-sensitive analysis, flexibly considering the
factual context instead of articulating an across-the-
board rule……………………………………...……..22

2. The Supreme Court decisions in *Johanns* and *Summum*
remain context-sensitive and do not announce a
"catch-all" one factor control test for differentiating
government from private speech in every circumstance….24

3. This Court has not interpreted *Johanns* or *Summum* as
establishing a one-factor control test applicable to every
set of circumstances and incompatible with the *SCV*
factors…………………………………………………..31

4. The vast majority of sister circuits also have not
interpreted *Johanns* or *Summum* as establishing a one-
factor control test applicable to every set of
circumstances and instead continue to apply the *SCV*
factors in concluding specialty license plate implicate
private speech…………………………………………..35

5. Defendants' adoption of *Bredesen*'s novel "catch all"
test overlooks private speech elements in the State's
specialty license plate forum, with dire potential
consequences for First Amendment liberties…………….38

iii

CONCLUSION…………………………………………………………...52

REQUEST FOR ORAL ARGUMENT…………………………………...52

CERTIFICATE OF COMPLIANCE……………………………………...53

CERTIFICATE OF SERVICE……………………………………………54

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases:**

*ACLU of Tenn. v. Bredesen*, 441 F.3d 370 (6th Cir. 2006)...……………….. *passim*

*Arizona Life Coal. Inc. v. Stanton*, 515 F.3d 956 (9th Cir. 2008)..………….. *passim*

*Choose Life of Illinois v. White*, 547 F.3d 853 (7th Cir. 2008)……………....*passim*

*Darveau v. Detecon, Inc.*, 515 F.3d 334 (4th Cir. 2008)………………………..…6

*Grosjean v. Bommarito*, 302 F. App'x 430 (6th Cir. 2008)………………………39

*Johanns v. Livestock Marketing Association*, 544 U.S. 500 (2005)………....*passim*

*Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001)…………………..23, 24

*Lewis v. Wilson*, 253 F.3d 1077 (8th Cir. 2011)………………………………..13

*N.Y. Trust Co. v. Eisner*, 256 U.S. 345 (1921)…………………………………47

*Page v. Lexington County School District One*,
531 F.3d 275 (4th Cir. 2008)……………………………………...…… *passim*

*Perry v. McDonald*, 280 F.3d 159 (2nd Cir. 2001)……………………………….13

*Planned Parenthood of S.C., Inc. v. Rose*, 361 F.3d 786 (4th Cir. 2004)……*passim*

*Planned Parenthood of S.C., Inc. v. Rose*,
373 F.3d 580 (4th Cir. 2004)………………………………………...7, 15, 36, 51

*Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009)……………… *passim*

*Roach v. Stouffer*, 560 F.3d 860 (8th Cir. 2009)……………………………… *passim*

*Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819 (1995)….. *passim*

v

*Rust v. Sullivan*, 500 U.S. 173 (1991)………………..…….….……… *passim*

*Sons of Confederate Veterans, Inc. v. Comm'r of Va. Dep't of Motor Vehicles*, 288 F.3d 610 (4th Cir. 2002)……………………………….... *passim*

*Sons of Confederate Veterans, Inc. v. Comm'r of Va. Dep't of Motor Vehicles,* 305 F.3d 241 (4th Cir. 2002)……………………………….. *passim*

*Summum v. Pleasant Grove City*, 483 F.3d 1044 (10th Cir. 2007)………………33

*Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622 (1994)…………………..7

*Turner v. City Council of the City of Fredericksburg,* 534 F.3d 352 (4th Cir. 2008)……………………………………….. *passim*

*United States v. Kokinda*, 497 U.S. 720 (1990)…………………………………...23

*WV Assoc. of Club Owners and Fraternal Serv., Inc. v. Musgrave,* 553 F.3d 292 (4th Cir. 2009)………………………………………... *passim*

*West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624 (1943)…………………...50, 51

*Women's Emergency Network v. Bush*, 323 F.3d 937 (11th Cir. 2003)………..9, 10

*Wooley v. Maynard*, 430 U.S. 705 (1977)………………………….. *passim*

**State Statutes:**

N.C. Gen. Stat. § 20-79.4(a) (2013)…………………………………………..2

N.C. Gen. Stat. § 20-79.4(a)(1) (2013)…………………………………………2

N.C. Gen. Stat. § 20-79.4(a)(2) (2013)…………………………………………2

N.C. Gen. Stat. § 20-79.4(a)(3) (2013)…………………………………………2

N.C. Gen. Stat. § 20-79.4(b) (2013)………………………………………....2, 42

N.C. Gen. Stat. § 20-79.4(b)(12) (2013)…………………………………...13, 49

N.C. Gen. Stat. § 20-79.4(b)(55) (2013)…………………………………...2, 42, 45

N.C. Gen. Stat. § 20-79.4(b)(65) (2013)…………………………………….2, 43

N.C. Gen. Stat. § 20-79.4(b)(129) (2013)…………………………………….2

N.C. Gen. Stat. § 20-79.4(b)(184) (2013)…………………………………13, 49

N.C. Gen. Stat. § 20-79.7(b) (2013)…………………………………..2, 31, 41

N.C. Gen. Stat. § 20-81.12…………………………………………………..41

N.C. Gen. Stat. § 20-81.12(a)………………………………………………..11

N.C. Gen. Stat. § 20-81.12(b)(84) (2013)……………………………2, 3, 11, 41

**Law Review Articles:**

Andy G. Olree, *Specialty License Plates:*
*Look Who's Talking in the Sixth Circuit*, 68 Ala. Law. 213 (2007)………25, 45, 50

Andy Olree, *Identifying Government Speech*,
42 Conn. L. Rev. 365 (2009)…………………………………………….. *passim*

R. Bezanson & W. Buss, *The Many Faces of Government Speech*,
86 Iowa L.Rev. 1377 (2001)…………………………………………...............29

## STATEMENT OF THE ISSUES

Did the District Court properly grant summary judgment in favor of the Plaintiffs given that the government allowed only one side of the abortion debate to speak through the North Carolina specialty license plate forum?

## STATEMENT OF THE FACTS

On June 18, 2011, the North Carolina General Assembly passed House Bill 289, entitled "An Act to Authorize the Division of Motor Vehicles [hereinafter the DMV"] to Issue Various Special Registration Plates" [hereinafter the "Act"].  J.A. 71 ¶ 19.  Governor Beverly Perdue signed the bill into law on June 30, 2011.  *Id.* The relevant provisions of the Act became effective upon its passage.  *Id.*

The Act created scores of new specialty license plates, including one plate urging viewers to "Choose Life." *Id.* at ¶ 20.   The legislature[1] has previously

_____

[1] Legislative approval is generally required for specialty license plates.  License plates for qualifying civic clubs, N.C. Gen. Stat. § 20-79.4(b)(42), colleges, and universities, N.C. Gen. Stat. § 20-81.12(a), however, are available without legislative approval.  The DMV must receive 300 applications before issuing civic, N.C. Gen. Stat. § 20-79.4(b)(42), or collegiate plates.  N.C. Gen. Stat. § 20-81.12(a).  Civic organization plates "bear a word or phrase identifying the civic club and the emblem of the civic club." N.C. Gen. Stat. § 20-79.4(b)(42).  Groups, including the Sons of Confederate Veterans, DMV, *Civic Clubs Plates*, https://edmv-sp.dot.state.nc.us/sp/SpecialPlatesList?category=civic  (last  visited March 21, 2013), and out of state schools that rival North Carolina institutions academically   and   athletically,   DMV,   *Collegiate   Plates*,   https://edmv-sp.dot.state.nc.us/sp/SpecialPlatesList;jsessionid=7c30fb9118febe4494607e3f37d3 d6b762e4?category=collegiate (last visited March 21, 2013), have thus received specialty license plates.  The government "has final approval authority over the images and wording that appear on all specialty plates."  Br. of Appellants at 18-

authorized a large number and wide variety of specialty plates, J.A. 71 ¶ 20, including "Corvette Club," N.C. Gen. Stat. § 20-79.4(b)(55) (2013), "Don't Tread on Me," N.C. Gen. Stat. § 20-79.4(b)(65) (2013), and the "National Rifle Association," N.C. Gen. Stat. § 20-79.4(b)(129) (2013). The Act brings the total number of specialty license plates available in North Carolina to well over 200. N.C. Gen. Stat. § 20.79.4(b) (2013).

The "Choose Life" plate costs $25.00 annually in addition to the regular yearly registration fees. N.C. Gen. Stat. § 20-79.7(b) (2013). From this price, $15.00 of every plate sold will go to the Carolina Pregnancy Care Fellowship, N.C. Gen. Stat. § 20-81.12(b84) (2013), a private organization which funds and supports crisis pregnancy centers in North Carolina. J.A. 71 ¶ 23. According to its website at the time of the filing of this action,

> the Carolina Pregnancy Care Fellowship (CPCF) is a statewide, 501(c)(3) nonprofit, pro-life organization committed to offering help and encouragement to those God calls into pregnancy care ministry, especially those located in North Carolina. The Carolina Pregnancy Care Fellowship is the official state contact for Choose Life, Inc., the national organization devoted to getting the Choose Life license plates on the road in all fifty states.

*Id.* The funds collected from the "Choose Life" plate are expressly prohibited from "be[ing] distributed to any agency, organization, business, or other entity that

---

19; *see also* N.C. Gen. Stat. § 20-79.4(a)-(a3) (2013); N.C. Gen. Stat. § 20-81.12(a).

provides, promotes, counsels, or refers for abortion." *Id.* The remaining $10 goes to the North Carolina Highway Fund, as is also the case for other plates authorized by the Act. J.A. 40-43.

The Act provides that the DMV is only authorized to develop the plate once it has received 300 applications from individuals. *Id.* at 71 ¶ 24; N.C. Gen. Stat. § 20.81.12(b84). The applications are received through the Carolina Pregnancy Care Fellowship. *Id.* at 72 ¶ 25. The Carolina Pregnancy Care Fellowship has received the requisite 300 applications for the "Choose Life" plate. J.A. 116.

Once the DMV issues the "Choose Life" plate, it will be available to any interested vehicle owner in the State of North Carolina. *Id.* at 72 ¶ 27. Specialty license plates "allow citizens with common interests to ***promote themselves and/or their causes***." DMV, *Specialized License Plates*, https://edmv-sp.dot.state.nc.us/sp/SpecialPlates?serviceType=EXP&fM=Y (last viewed on March 21, 2013) (emphasis added). The DMV invites automobile owners to "[s]how off your Special Interest with one of our plates." DMV, *Special Interest Viewer*, https://edmv-sp.dot.state.nc.us/sp/demo/special_viewer_specialinterest.htm (last visited on March 21, 2013). Representative Tim Moore underlined the intent of the "Choose Life" plates when he told the North Carolina House Finance Committee on June 2,

2011, that they constituted "voluntary *speech that people are making* by purchasing the license plate." J.A. 21 at ¶ 33 (emphasis added).

During the 2011 Legislative Session, various legislators proposed amendments to House Bill 289 to include another specialty plate that would state: "Trust Women. Respect Choice," or simply "Respect Choice." J.A. 116. Such amendments were offered six times; each time they were rejected. *Id.*

Plaintiffs are North Carolina vehicle owners interested in obtaining a specialty license plate with a slogan supporting a woman's right to reproductive choice. *Id.* In light of the actions of the North Carolina General Assembly, they are unable to make their voices heard through specialty license plates.

## SUMMARY OF THE ARGUMENT

The State is engaged in viewpoint discrimination by allowing only one side of the abortion debate to speak through its specialty license plate forum. The First Amendment is designed to protect private speakers from exactly that type of abuse, and the District Court correctly concluded legislation authorizing a "Choose Life" license plate without a countervailing alternative is unconstitutional.

This Court has held that specialty license plate forums generally, and "Choose Life" license plates specifically, implicate private speech such that viewpoint neutrality is required. The Supreme Court has similarly held that viewpoint discrimination is unconstitutional in forums designed to facilitate private

4

speech.  As the District Court concluded, these precedents remain good law and govern the current controversy.

These precedents demonstrate the North Carolina specialty license plate forum and the "Choose Life" plate feature predominantly private speech elements. The purpose of this forum is to allow individuals to promote and support their special interests.  License plate messages are generally connected to a vehicle owner.  Specialty license plates strengthen this connection by requiring individuals to apply and pay an additional sum to express their chosen message.  And individuals are ultimately responsible for the "Choose Life" message as they must submit 300 pre-paid applications before North Carolina creates the specialty license plate.

The State asks this Court to disregard binding Supreme Court and Fourth Circuit precedent and adopt a "catch all" control test for differentiating government from private speech in every set of circumstances.  Such an approach has been correctly rejected by the Supreme Court, this Court, the vast majority of its sister circuits, and the District Court.  Government speech jurisprudence makes plain the rationale for its rejection: First Amendment concerns differ based on distinct facts, calling for a context-sensitive approach to determining the identity of the speaker. An across-the-board control test would undermine First Amendment liberties long taken for granted, including in specialty license plate forums.

## ARGUMENT

## STANDARD OF REVIEW

This Court reviews *de novo* the District Court's grant of summary judgment to Plaintiffs. *E.g.*, *Darveau v. Detecon, Inc.*, 515 F.3d 334, 338 (4th Cir. 2008).

## DISCUSSION OF THE ISSUES

I. **THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT IN FAVOR OF THE PLAINTIFFS GIVEN THAT THE GOVERNMENT ALLOWED ONLY ONE SIDE OF THE ABORTION DEBATE TO SPEAK THROUGH THE NORTH CAROLINA SPECIALTY LICENSE PLATE FORUM.**

   A. **The District Court correctly concluded this Court's four-factor test demonstrates that "Choose Life" specialty license plates implicate private speech such that North Carolina cannot engage in viewpoint discrimination by refusing to offer a countervailing alternative.**

The District Court correctly concluded that North Carolina specialty license plates implicate private speech. J.A. 132 (noting "[S]ufficient private speech interests are implicated by the specialty license plates to preclude a finding of purely governmental speech. The court finds that this conclusion is in keeping with the common sense notion that the North Carolina specialty license plate program as a whole, and the Choose Life plates in particular, are, at bottom, a government-sponsored avenue to encourage private speech."); *see also Sons of Confederate Veterans, Inc. v. Comm'r of Va. Dep't of Motor Vehicles*, 288 F.3d 610 (4th Cir. 2002) [hereinafter "*SCV*"]; *Planned Parenthood of S.C., Inc. v. Rose*,

6

361 F.3d 786 (4th Cir. 2004). The District Court, in turn, correctly held "that the State's offering of a 'Choose Life' license plate in the absence of a pro-choice plate constitutes viewpoint discrimination in violation of the First Amendment." J.A. 132; *see also Rose*, 361 F.3d at 799.[2]

Whether viewpoint discrimination is permissible in the current controversy depends on the nature of the "Choose Life" license plate speech. "The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009). Viewpoint discrimination is thus permissible only "when the

---

[2] North Carolina's "Choose Life" license plate is not per se constitutionally suspect. Offering a "Choose Life" license plate while not allowing any countervailing alternative, however, "raises the 'inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion . . .' – in other words, to exercise viewpoint discrimination. *SCV*, 288 F.3d at 624 (quoting *Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642-43 (1994)). Defendants hint the State has not engaged in viewpoint discrimination by offering only a "Choose Life" license plate. Br. of Appellants at 29 ("'Choose Life' and 'Respect Choice' are not . . . even necessarily contradictory views in the abortion debate."). The District Court and each judge in *Rose* rejected this argument. J.A. 132; *see also* Rose, 373 F.3d at 581 (Wilkinson, J., concurring in the denial of the rehearing en banc) ("I simply do not believe the state should use license plates to practice viewpoint discrimination. That is plainly what is happening here. The state is saying that its citizens may express one view on a profound controversy but not the other."). Defendants' claim of viewpoint neutrality is further undermined by the fact that funds from the "Choose Life" plate are earmarked for a "pro-life organization" and expressly prohibited from "be[ing] distributed to any agency, organization, business, or other entity that provides, promotes, counsels, or refers for abortion." J.A. 71 ¶ 23.

government speaks for itself and is not regulating the speech of others." *Rose*, 361 F.3d at 792.    Conversely, "[i]n the realm of private speech or expression, government regulation may not favor one speaker over another." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).    The government also cannot engage in viewpoint discrimination in its regulation of speech with "mixed (both government and private)" elements. *Rose*, 361 F.3d at 794-99; *see also id.* at 800 (Luttig, J., writing separately and concurring in the judgment) ("[A]t least where the private speech component is substantial and the government speech component less than compelling, viewpoint discrimination . . . is prohibited.").

This Court has crafted a non-exhaustive, flexible four-factor test for categorizing speech as governmental, private, or hybrid, *SCV*, 288 F.3d at 619, "the dispositive issue" in the current controversy. J.A. 117.  The test examines:

> (1) the central purpose of the program in which the speech in question occurs; (2) the degree of editorial control exercised by the government or private entities over the content of the speech; (3) the identity of the literal speaker; and (4) whether the government or private entity bears the ultimate responsibility for the content of the speech.

*SCV*, 288 F.3d at 618 (internal quotation marks omitted).  This Court applied the four-factor test in both of its considerations of specialty license plates.  A state bar on the Sons of Confederate Veterans' use of the Confederate flag on its specialty license plate was unconstitutional "[b]ecause the speech . . . is the SCV's rather

than Virginia's[.]" *Id.* at 622. This Court subsequently concluded that South Carolina's "Choose Life" license plate, "substantially similar" in its origin and content to the license plate at the center of this situation, J.A. 86, "embodie[d] a mixture of private and government speech." *Rose*, 361 F.3d at 793; *see also id.* at 800 (Luttig, J., writing separately and concurring in the judgment) ("[V]anity license plates are quintessential examples of . . . hybrid speech."). Viewpoint discrimination was therefore constitutionally impermissible. *Rose*, 361 F.3d at 794-99. Applying these factors to North Carolina's specialty license plate scheme produces the same result.[3]

### 1. The "central purpose" of the North Carolina license plate program is to allow for the private expression of various special interests as well as to raise revenue for the State.

The "central purpose[s]" behind specialty license plate forums,[4] such as the one operated by North Carolina, are "to produce revenue" and allow "for the

---

[3] Defendants essentially concede this point as they never apply the *SCV* factors to the current controversy in their brief. Defendants instead argue "government control over speech in question is the touchstone for what constitutes government speech." Br. of Appellants at 4.

[4] The correct focus in this analysis is "the special plate program as a whole." *SCV*, 288 F.3d at 619; *see also Roach v. Stouffer*, 560 F.3d 860, 867 (8th Cir. 2009); *Ariz. Life Coal. v. Stanton*, 515 F.3d 956, 965-66 (9th Cir. 2008); *Women's Emergency Network v. Bush*, 323 F.3d 937, 945 n.9 (11th Cir. 2003). Judge Michael's decision in *Rose* held that this factor implicated government speech, accepting the State's argument "that the ***Act's purpose*** is to promote the State's preference for the pro-life position." *Rose*, 361 F.3d at 793 (emphasis added). Plaintiffs respectfully suggest that the correct focus under this factor is the specialty license program, not the authorizing legislation. *SCV*, 288 F.3d at 619;

private expression of various views." *SCV*, 288 F.3d at 619.[5] Neither purpose

indicates government speech. This Court has highlighted the substantial revenue

realized through specialty license plate programs. *Id.* The positive "net financial

impact of the program" indicates that the government is not making a "selective

funding decision[]," a hallmark of government speech. *Id.*; *see also Rust v.*

*Sullivan*, 500 U.S. 173, 192 (1991) ("[T]he Government has not discriminated on

the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of

---

*see also* J.A. 131 ("To state that the purpose of the relevant statute was to express
the State's message of supporting the idea of choosing life over abortion is to
ignore the larger governmental specialty license program as a whole."); Andy
Olree, *Identifying Government Speech*, 42 Conn. L. Rev. 365, 384 (2009)
("Judging the government's purpose or message by reference to the 'Choose Life'
life statute, in isolation, ignores the governmental actions and operational context
which made such statutes and messages possible."). Under these circumstances,
this is largely a distinction without a difference as even a narrower focus on the
relevant Act and the large number of specialty plates approved therein, J.A. 29-43,
is also wholly incompatible with a singular purpose to express a "preference for the
pro-life position." *Rose*, 361 F.3d at 793.

[5] Other circuits considering specialty license plates discern a similar purpose. *See*
*Roach*, 560 F.3d at 867 ("The primary purpose of Missouri's specialty plate
program is to allow private organizations to promote their messages and raise
money and to allow private individuals to support those organizations and their
messages."); *Choose Life Illinois, Inc. v. White* 547 F.3d 853, 863 (7th Cir. 2008)
("The plates serve as 'mobile billboards' for the organizations and like-minded
vehicle owners to promote their causes and also are a lucrative source of funds");
*Ariz. Life Coal.*, 515 F.3d at 965-66 ("Life Coalition argues that the specialty
license plates offer something more: 'the opportunity to identify themselves with
individualized messages via these specialized plates' as well as 'the opportunity to
benefit worthy organizations financially.' We agree with Life Coalition . . . The
revenue raising purpose of the Arizona special organization plate program supports
a finding of private speech."); *Women's Emergency Network v. Bush*, 323 F.3d
937, 945 n.9 (11th Cir. 2003) ("Furthermore, the program is structured to benefit
the organizations that apply for and sponsor the plates.").

the other."). Furthermore, a specialty license plate scheme predicated on prepaid applications suggests a confluence of these purposes by ensuring that "only special plate messages popular enough among private individuals to produce a certain amount of revenue will be expressed." *SCV*, 288 F.3d at 620.

The North Carolina specialty license plate forum features similar revenue and private expressive purposes. Each "Choose Life" plate sold produces a $10 windfall for the North Carolina Highway Fund, as is the case of other plates authorized through the legislation. J.A. 40-43. The remaining $15 goes to the Carolina Pregnancy Care Fellowship, J.A. 71 ¶ 23, with similar allocations governing other plates authorized by the Act. J.A. 40-43. "Choose Life" plate production is only triggered upon the DMV receiving 300 applications, J.A. 71 ¶ 24; N.C. Gen. Stat. § 20.81.12(b84), the case for many other plates as well. J.A. 30-38; N.C. Gen. Stat. § 20.81.12(a)-(b84). This "curious" trigger, *SCV*, 288 F.3d at 620, undercuts any notion that specialty license plates are government speech.

The government's characterization of the specialty license plate forum further underlines this reality. The DMV invites automobile owners to "[s]how off your Special Interest with one of our plates." DMV, *Special Interest Viewer*, https://edmv-sp.dot.state.nc.us/sp/demo/special_viewer_specialinterest.htm (last visited on March 21, 2013). Specialty plates "allow citizens with common interests to ***promote themselves and/or their causes***." DMV, *Specialized License*

*Plates*,  https://edmv-sp.dot.state.nc.us/sp/SpecialPlates?serviceType=EXP&fM=Y
(last viewed on March 21, 2013) (emphasis added).  In light of these facts, "this
factor weighs in favor of finding the Choose Life license plates constitute private
speech." J.A. 131.

> ## 2. The government exercises editorial control over the "Choose Life" license plates.

The parties agree "that the State exercises complete editorial control over the
'Choose Life' license plates, even if the idea for the plate may have originated with
the national Choose Life organization," *id.*, and Defendant produced no evidence
that it frequently, if ever, exercises said control.  *See SCV*, 288 F.3d at 621.  As
was the case in *Rose*, this factor alone is not determinative.  361 F.3d at 793.

> ## 3. The close connection between the "Choose Life" license plate message and the vehicle owner who chooses to display it on his or her car indicates the vehicle owner is the literal speaker behind this message.

The nature of license plates generally, as well as the individual efforts
necessary to obtain a specialty license plate, establish the vehicle owner is the
"literal speaker." *Id.* at 793-94.  License plate messages on a vehicle are "readily
associated with its operator."  *Wooley v. Maynard*, 430 U.S. 705, 715 n.15 (1977).[6]

---

[6] Defendant-Appellant argues "*Wooley* does not govern here because, instead of
being forced to be the 'courier for [the government's] message, motorists consent
to carry the government's message."  Br. of Appellants at 11.  Setting aside the
irony inherent in Defendants' arguing for an across-the-board control test for
government speech, *id.* at 7, and then a context-sensitive application of *Wooley*,

"[E]ven when owned by the government," license plates "implicate private speech interests because of the connection of any message on the plate to the driver or owner of the vehicle." *SCV*, 288 F.3d at 621; *see also Rose*, 361 F.3d at 794. The connection "is much stronger when the vehicle owner displays a specialty license plate" because he or she identified with the message on the plate to the extent that he or she purchased it and displayed it on his or her car. *Rose*, 361 F.3d at 794.[7] Messages on particular specialty license plates make the connection explicit. N.C. Gen. Stat. 20-79.4(b)(184) (2013) (offering a specialty license plate bearing the phrase "*I'd* Rather Be Shaggin'") (emphasis added); N.C. Gen. Stat. 20-79.4(b)(12) (2013) ("The plate may bear a picture of a dog and cat and the phrase '*I* care.'") (emphasis added). In the case of "Choose Life" license plates, an individual obtaining such a plate for his or her car clearly "holds a pro-life viewpoint" they wish to communicate. *Rose*, 361 F.3d at 794.

---

their point is right in a narrow sense. *Wooley* is cited not as controlling the current controversy, but for the proposition that the owner of a car has such a strong connection to the messages displayed on his or her car that he or she effectively owns that message. 430 U.S. at 715 n.15.

[7] There is again broad circuit agreement on point. Specialty license plates have widely been held to implicate private speech. *See Perry v. McDonald*, 280 F.3d 159, 166 (2nd Cir. 2001) (analyzing a restriction on vanity plates as "concerning private individuals' speech on government-owned property"); *Lewis v. Wilson*, 253 F.3d 1077, 1079 (8th Cir. 2011) (analyzing a restriction prohibiting vanity plates "contrary to public policy" as a restriction on private individuals' speech). Applying the *SCV* factors, other circuits have widely concluded that the vehicle owner is the "literal speaker" behind a specialty license plate. *See Roach*, 560 F.3d at 867-68; *Choose Life*, 547 F.3d at 864-65; *Ariz. Life Coal.*, 515 F.3d at 967.

13

There is a close connection between a vehicle owner and a "Choose Life" plate he or she displays. To display a "Choose Life" plate a North Carolina vehicle owner would have to apply to the DMV and pay an additional $25.00. Representative Tim Moore correctly described this action as "voluntary *speech that people are making* by purchasing the license plate." J.A. 21 at ¶ 33 (emphasis added). The specialty plate program is then best understood as allowing "citizens with common interests to *promote themselves and/or their causes*." DMV, *Specialized License Plates*, https://edmv-sp.dot.state.nc.us/sp/SpecialPlates?serviceType=EXP&fM=Y (last viewed on March 21, 2013) (emphasis added).

### 4. The means through which a vehicle owner obtains the "Choose Life" license plate for his or her car indicates the vehicle owner is ultimately responsible for this message.

The structure of the specialty license plate forum demonstrates the vehicle owner is ultimately responsible for the "Choose Life" message carried by his or her car. Even state-issued, standard license plate messages are "readily associated with its operator." *Wooley*, 430 U.S. at 715 n.15. The argument that the state is "ultimately responsible" degrades further in the case of specialty license plates because the displayed messages "are selected by the drivers themselves." *See SCV*, 305 F.3d 241, 244 (4th Cir. 2002) (Williams, J., concurring in the denial of rehearing en banc); *see also SCV*, 288 F.3d at 621. "The speech here only

becomes speech by virtue of a citizen's choice," testifying to private ultimate responsibility. *Rose*, 373 F.3d 580, 581 (4th Cir. 2004) (Wilkinson, J., concurring in the denial of rehearing en banc); *see also SCV*, 305 F.3d 241 at 246 (Luttig, J., concurring in the denial of rehearing en banc) ("Indeed 'but for' . . . the private individual's action, the special license plate would not even exist; . . . private individuals must request that they be issued such a plate and pay for it over and above the cost exacted for a standard license plate.").[8]

"Choose Life" license plates cannot end up on North Carolina vehicles without individual expressive action.  A vehicle owner must apply and pay extra to even place such a plate on his or her car.  Most tellingly, the government did not create the "Choose Life" message it now claims upon legislative authorization; the plates are only available after 300 applications are submitted.  Making individual action the predicate to the creation of "Choose Life" plates demonstrates specialty license plates are designed to allow individual drivers to "show off their own 'special interest' . . . , as opposed to joining the State in spreading the State's 'message.'" J.A. 132.

The District Court's application of the *SCV* factors demonstrates North Carolina's "Choose Life" license plates contain features of governmental and

---

[8] Sister circuits again widely agree with this Court's conclusion that the "ultimate responsibility" for specialty license plates points to private speech. *See Ariz. Life Coalition*, 515 F.3d at 968; *Choose Life*, 547 F.3d at 864; *Roach*, 560 F.3d at 867-68.

private speech.  *Id.*  Private speech predominates to the extent that the specialty license forum serves as an outlet for private views, *see, e.g., SCV*, 288 F.3d at 619, and specialty plate messages are closely connected to and their existence dependent upon private actors.  *See, e.g., Rose*, 361 F.3d at 794.  Only the "editorial control" factor points towards governmental speech.  J.A. 131.  "Choose Life" plates are thus mixed speech with primarily private elements.  J.A. 130-132. Viewpoint discrimination is constitutionally impermissible in such a context. *See, e.g., Rose*, 361 F.3d at 799.  The District Court thus correctly concluded, "as did each of the judges in *Rose*, that the State's offering of a Choose Life license plate in the absence of a pro-choice plate constitutes viewpoint discrimination in violation of the First Amendment."  J.A. 132.

**B.** **The District Court correctly concluded this Court's durable and oft-employed four-factor government speech test was not overruled in *Page* and still governs the current controversy.**

Defendants argue the *SCV* factors have been overruled by this Court's decision in *Page v. Lexington County School District One*, 531 F.3d 275, 281 (4th Cir. 2008).  A review of this Court's government speech jurisprudence establishes beyond question that the District Court was right to conclude that "*Page* does not prohibit the consideration of other relevant [*SCV*] factors."  J.A. 130.

This Court's four-factor test for distinguishing governmental from private speech governs the consideration of specialty license plates.  In adopting the four-

factor test, this Court eschewed a "one-size fits all" jurisprudence for context-specific flexibility. J.A. 128. "Although we do not conclude that the [four factor test] constitute[s] an exhaustive or always-applicable list," *SCV*, 288 F.3d at 619, this Court found each factor pertinent to its examination of Virginia's specialty license plate forum. *Id.* at 619-21. "*SCV*'s First Amendment rights" were implicated by Virginia's ban on a Confederate flag logo on the group's specialty license plate pursuant to the test, making viewpoint discrimination impermissible. This Court again applied each of these *SCV* factors to South Carolina's "substantially similar" "Choose Life" license plate, J.A. 86, finding "a mixture of private and government speech." *Rose*, 361 F.3d at 793. This Court has neither subsequently proposed another test for judging government speech in the context of specialty license plates, nor called into question the use of the factors in these cases. In short, the four *SCV* factors govern the question of whether specialty license plates constitute government speech.

This Court has also utilized these factors in other contexts. For example, in *WV Ass'n of Club Owners and Fraternal Serv., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009), this Court applied *SCV* factors to conclude West Virginia video lottery advertising constituted "hybrid speech" featuring governmental and private elements. Similarly, this Court applied each of the four factors to conclude government speech was implicated by legislative prayers in *Turner v. City Council*

*of City of Fredericksburg*, 534 F.3d 352 (4th Cir. 2008). And, in *Page*, 531 F.3d at 281, this Court distilled the four factors to focus on the government's "establishment of" and "control over" message content and dissemination. This Court has thus adhered to the context-sensitive approach outlined in *SCV*: the factors are the foundation, not a straightjacket. 288 F.3d at 619.

From this easily appreciated approach, Defendants attempt to create a conflict within this Court. They posit *Musgrave*, *Turner*, and *Page* "as inconsistent in using different factors, in which case the earliest precedent—*Page*—controls." Br. of Appellants at 34.[9] Defendants' assertion is easily dismissed. It first ignores that each of these cases identifies the *SCV* factors as the foundation for this Court's government speech analysis, testifying to their fundamental consistency. *Musgrave*, 553 F.3d at 299; *Turner*, 534 F.3d at 354; *Page*, 531 F.3d at 281. Second, it ignores the emphasis this Court has placed upon context-sensitive flexibility in its use of the *SCV* factors. 288 F.3d at 619; *see also Turner*, 534 F.3d at 355 ("But given the focus of the prayers on government business at the opening of the Council's meeting, we agree with the District Court that the prayers at issue are government speech."). There is no inconsistency here but instead a reflection of the nature of the *SCV* factors: "different factors will be relevant in different cases." J.A. 129.

---

[9] If Defendants are correct that *Page* displaced *SCV*, then each case decided pursuant to these factors requires reconsideration.

In the alternative, Defendants argue unpersuasively that *Page* governs the current controversy as "the most factually similar case." Br. of Appellants at 34. This argument, of course, ignores the fact that *SCV* and the "substantially similar" *Rose*, J.A. 86, both involved specialty license plates, while *Page* did not.

Defendants argue *Page*'s distillation of the *SCV* factors governs the current controversy in an effort to elude case law directly on point. *Page* held in circumstances "involving the government's use of third-party messages," this Court should focus on "1) the government's establishment of the message, and (2) its effective control over the content and dissemination of the message." 531 F.3d at 281. Defendants bypass distinguishing facts to avail themselves of this rule. *Page* involved a county school district opposing a statute via means completely inaccessible to private actors. *Id.* at 277-78. To the extent third-party materials were used by the county on its website and its emails, "[t]here is no suggestion" that these third-parties "took any initiative to be included on the School District's website." *Id.* at 284. "The School District 'disclaimed' the contents of any linked website, making it clear that only that which was stated on its own website should be taken as the School District's speech." *Id.* These facts supported a finding of government speech as the school district "never allowed private persons to participate in the channels through which it disseminated its message." *Id.* at 288.

In contrast, the functioning of specialty license plates depends on private action and is best understood as "a government-sponsored avenue to encourage private speech." J.A. at 132. Private initiative in the form of the requisite 300 applications, the payment of an additional fee, and the vehicle owner placing a specialty license plate on his or her car is a predicate to dissemination and testifies to private participation in the channel of communication. *Id.* at 71 ¶ 23-24. On the other hand, private actors could not participate in the school district's website and emails regardless of personal initiative. 531 F.3d at 277-79. And, whereas the school district in *Page* took steps to ensure it was only embracing its "consistent message" via a disclaimer of private speech it linked to, *id.* at 284, the State has not presented evidence of such an overarching message or disclaimers here. The Defendants have it backwards: the facts speak to private actors using governmental property to speak, not the government use of "third-party messages" that led this Court to distill the *SCV* factors in *Page*. *Id.* at 281. The District Court thus rightly concluded "the factual underpinnings of *Page* are quite distinguishable from the instant controversy, and . . . that *Page* does not prohibit the consideration of other relevant factors." J.A. 130.

For over a decade, this Court has used the *SCV* factors time and again to identify government, private, and mixed speech. All four factors were applied in *SCV*, 288 F.3d at 619-21, and *Rose*, 361 F.3d at 791-94, in determining,

respectively, Virginia and South Carolina specialty license plates implicated private speech. These factors serve as the foundation for this Court's government speech jurisprudence in other contexts as well. *See, e.g.*, *Turner*, 534 F.3d at 354. Their flexible application speaks not to inconsistency, but instead the intended context-sensitivity. *SCV*, 288 F.3d at 619. The decision in *Page* builds upon, rather than undermines, this approach. 531 F.3d at 281 (discussing context-based distillation of factors). Put simply, this Court applies the *SCV* factors flexibly, yet consistently, and utilizes all four in its analysis of specialty license plates.

### C.   The District Court correctly concluded *Johanns* and *Summum* did not invalidate the *SCV* factors by creating a one-factor, across-the-board control test for government speech.

Defendants also attempt to escape the *SCV* factors by orchestrating a sea change in Supreme Court government speech jurisprudence. They contend "unlike the four-factor test developed in *SCV*, *Summum* and *Johanns* [*v. Livestock Marketing Ass'n*, 544 U.S. 500 (2005)] focus on the level of control the government exercises over speech." Br. of Appellants at 7. A brief review of the government speech doctrine indicates Defendants' proposed "catch all test," J.A. 89, n.6., has been rejected by the Supreme Court, this Court, and the vast majority of its sister circuits. The rationales for its rejection are plain: First Amendment concerns differ based on distinct facts; this calls for a context-sensitive approach to determining the identity of the speaker. An across-the-board control test would

undermine First Amendment liberties long taken for granted, including in specialty license plate forums.  The District Court thus fairly concluded "to extrapolate that control is the only factor in determining government speech is to read *Johanns* and *Summum* in a vacuum, without regard to their factual underpinnings."  J.A. 125.

1. **The government speech doctrine prior to *Johanns* was a context-sensitive analysis, flexibly considering the factual context instead of articulating an across-the-board rule.**

Supreme Court government speech jurisprudence, like that of this Court, relies upon context-sensitive analysis, not the "one-size fits all single factor test" Defendants propose.  J.A. 128.  "The government speech doctrine, as articulated by the U.S. Supreme Court, had its genesis in *Rust*."  Olree, *Identifying Government Speech*, 42 Conn. L. Rev. 365, 374 (2009).  "In *Rust*, Congress authorized, pursuant to Title X of the Public Health Service Act . . . subsidies to be provided to doctors and clinics in order to advise patients on family planning topics."  J.A. 121.  Within this program, doctors were prohibited from providing "counseling, referral, and the provision of information regarding abortion as a method of family planning."  *Rust*, 500 U.S. at 193.  Rejecting a challenging to this restriction, the Court explained "[t]he government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way."  *Id.*  Government support was not

dispositive: "[f]or example, this Court has recognized that the existence of a Government 'subsidy,' in the form of Government-owned property, does not justify the restriction of speech in areas that have been traditionally open to the public for expressive activity.'" *Id*. at 199-200 (quoting *United States v. Kokinda*, 497 U.S. 720, 726 (1990)). *Rust* represents one end of the government-private speech continuum, but is limited: the government can send an overarching message to the exclusion of others through a program it created and funded, but only if its program has not been traditionally open to the public for expression.

The Supreme Court has carefully guarded against attempts to expand *Rust*. Re-iterating its limited nature, the Court noted "the government [in *Rust*] did not create a program to encourage private speech but instead used private speakers to transmit specific information pertaining to its own program." *Rosenberger*, 515 U.S. at 833. When a government program encourages private speech, the government cannot discriminate based on viewpoint. Accordingly, a university making funds available to student publications could not withhold financial support from a newspaper with a Christian perspective as its program was not government speech but instead "encourage[d] a diversity of views from private speakers." *Id.* at 834. "[T]he fact that student newspapers expressed many different points of view was an important foundation for the Court's decision to invalidate viewpoint-based restrictions." *Legal Services Corp. v. Velazquez*, 531

23

U.S. 533, 543 (2001) (discussing the Court's prior holding in *Rosenberger*). The Court further invalidated a restriction on federal Legal Services Corporation (LSC) funds being used in representation involving "an effort to amend or otherwise challenge existing welfare law." *Velazquez*, 531 U.S. at 536-37. Though not encouraging "a diversity of views, . . . the LSC program [like the program in *Rosenberger*] was designed to facilitate private speech, not to promote a government message." *Id.* at 541. And the LSC restrictions entailed "no programmatic message of the kind recognized in *Rust* and which sufficed there to allow the Government to specify the advice necessary for its legitimate objectives." *Id.* at 548. "[N]either the latitude for government speech nor its rationale applies . . . in every instance." *Id.* at 543.

> **2.    The Supreme Court decisions in *Johanns* and *Summum* remain context-sensitive and do not announce a "catch-all" one factor control test for differentiating government from private speech in every circumstance.**

The Supreme Court decisions in *Johanns* and *Summum* fit neatly within the aforementioned government speech jurisprudence. The cases do not announce "a new one-factor test," J.A. 127, but instead continue flexibly to consider the facts of, and harms threatened by, particular First Amendment controversies.

*Johanns*, 544 U.S. at 554, involved a government-imposed "$1-per-head assessment . . . on all sales or importation of cattle and a comparable assessment on imported beef products" and its use for "promotional campaigns." The

advertisements were designed by an Operating Committee "composed of 10 Beef Board members and 10 representatives named by a federation of state beef councils." *Id.* at 553-54. Parties disgruntled with paying the assessment sued, objecting to a compelled subsidy for allegedly private speech by contending "that speech whose content is effectively controlled by a nongovernmental entity—the Operating Committee—cannot be considered 'government speech.'" *Id.* at 560.

Numerous factors led the Court to reject this challenge and conclude "the message of the promotional campaigns is effectively controlled by the Federal Government itself." *Id.* Though it "solicit[ed] assistance from nongovernmental sources" in the promotional campaign, "Congress and the Secretary [of Agriculture] . . . set out the overarching message [of the promotional campaign] and some of its elements." *Id.* at 561-62. This control was not "limited to final approval or rejection: Officials of the Department [of Agriculture] also attend[ed] and participate[d] in the open meetings at which proposals [were] developed." *Id.* at 561. The assessment, in short, exemplified a government program "involv[ing], or entirely consist[ing] of, advocating a position." *Id.* at 559. Consequently, the holding was modest: "compelled support for government—even those programs one does not approve of—is of course perfectly constitutional, as every taxpayer must attest." *Id.* at 559; *see also* Andy G. Olree, *Specialty License Plates: Look Who's Talking in the Sixth Circuit*, 68 Ala. L. Rev. 213, 214 (2007) ("The take-

25

home message [from *Johanns*] was that government is always allowed to tax in order to fund its own communications.").

*Johanns* is best understood as carrying forward previously articulated principles in government speech jurisprudence. At bottom, *Rust* and *Johanns* are about the government's power to "fund a program to encourage certain activities it believes to be in the public interest." *Rust*, 500 U.S. at 192. This authority extended in the former to selectively "fund[ing] one activity to the exclusion of the other." *Id.* In the latter, this power permitted an exaction from particular parties "pursuant to a statutorily-prescribed program to promote the marketing and consumption of beef products." J.A. 125. The activity encouraged through an "overarching message," *Johanns*, 544 U.S. at 561, is easily identifiable in both instances. In *Rust*, the message was "family planning" without "abortion." *Rust*, 500 U.S. at 178. In *Johanns*, the message was "Beef. It's What's for Dinner." 544 U.S. at 554. The "overarching message," *Johanns* 544 U.S. at 561, in these cases is easily distilled as neither involved a program designed to "encourage a diversity of views from private speakers." *Rosenberger*, 515 U.S. at 834.

Accordingly, *Johanns* does not lend itself to the "catch-all test for government speech" Defendants propose. J.A. 89, n.6. *Johanns* exemplifies the Supreme Court's context-sensitive government speech jurisprudence. For example, the Court explicitly acknowledges "there might be a valid objection if

26

those singled out to pay the tax are closely linked with the expression in a way that makes them appear to endorse the government message" as in *Wooley*, [430 U.S. at 715]. *Johanns*, 544 U.S. at 565 n.8. The Court distinguishing *Johanns* from *Wooley* flatly contradicts Defendants' contention that there is a single-factor control test for identifying governmental speech. If control alone were pertinent, then *Wooley*'s conviction for covering up "Life Free or Die" on his New Hampshire-controlled license would have been upheld. 430 U.S. at 715; *see also ACLU of Tenn. v. Bredesen*, 441 F.3d 370, 386-87 (6th Cir. 2006) (Martin, J., concurring in part and dissenting in part) ("New Hampshire's government 'crafted' its own motto . . . [and] had ultimate control over [its] message[]. In [*Wooley*], the facts the majority found relevant here would indicate that the message was the government's own. But, this was not the approach the Supreme Court took . . . because it ignores the First Amendment interests at issue."). *Wooley*, 430 U.S. at 715, and *Johanns*'s recognition of its continued validity, 544 U.S. at 565 n.8, belie Defendants' contention that individual connections to messages are irrelevant in a government speech inquiry.

The *Summum* decision is a similarly context-sensitive analysis. The case centers on Pleasant Grove City, Utah's rejection of a Seven Aphorisms of SUMMUM monument proposed for construction in its Pioneer Park. *Summum*,

555 U.S. at 465. *Summum* begins with a description of the park and its current monuments:

> Pioneer Park . . . is a 2.5 acre public park in the Historic District of Pleasant Grove . . . in Utah. The Park currently contains 15 permanent displays, at least 11 of which were donated by private groups or individuals. These include an historic granary, a wishing well, the City's first fire station, a September 11 monument, and a Ten Commandments monument donated by the Fraternal Order of Eagles in 1971.

555 U.S. at 464-65. The fifteen monuments displayed in the park had a close connection with the city as they "either (1) directly relate to the history of Pleasant Grove, or (2) were donated by groups with longstanding ties to the Pleasant Grove community." *Id.* at 465. This close connection was expected; "[i]t certainly is not common for property owners to open up their property for the installation of permanent monuments that convey a message with which they do not wish to be associated." *Id.* at 471. In fact, "public parks are often closely identified in the public mind with the government unit that owns the land. City parks . . . commonly play an important role in defining the identity that a city projects to its own residents and to the outside world." *Id.* at 472. "***In this context, there is little chance that observers will fail to appreciate the identity of the speaker***." *Id.* at 471 (emphasis added).[10]

---

[10] Defendants assert "[t]he identity of the speaker as perceived by a third party is not relevant to the facial challenge at issue in this case." Br. of Appellants at 12.

The Supreme Court's analysis in *Summum*, in particular its emphasis on harm in this specific circumstance, is again consistent with prior government speech case law.  As was also the case in *Rust* and *Johanns*, the government "was not creating a forum to encourage private speech," J.A. 127, when it accepted private monument donations in its park.  Pleasant Grove never opened Pioneer Park "for the general display of monuments by private donors."  *Id.*  Rather, the city made plain the governmental nature of the speech via a resolution stating it would not accept any monuments without a close connection to the city.  *Summum,* 555 U.S. at 465.  "Public parks" in general "can accommodate only a limited number of permanent monuments."  *Id.* at 478.  "Like a school, museum, or clinic" imparting a government message, *Rose*, 361 F.3d at 795,[11] requiring viewpoint neutrality in a 2.5 acre public park "would lead almost inexorably to [its] closing."

---

This is inaccurate on multiple levels.  First, *Summum*'s discussion of how "**public parks are often closely identified in the public mind** with the government unit that owns the land," 555 U.S. at 472 (emphasis added), as well as Pleasant Grove's steps ensuring this identification, *id.* at 465, underscore its continued relevance.  Second, "[p]laintiffs challenge the Act both facially and as applied to each Plaintiff."  J.A. 13 ¶ 4.

[11]  Requiring viewpoint neutrality would have destroyed the overarching programmatic purpose in *Rust* of supporting "family planning" without "abortion."  500 U.S. at 178.  Similarly, "there is no First Amendment problem, for example, when a public school makes content-based decisions about its curriculum, see *Rosenberger*, 515 U.S. at 833, or when a public museum decides to display one work of art as opposed to another, see R. Bezanson & W. Buss, The Many Faces of Government Speech, 86 Iowa L. Rev. 1377, 1422 (2001);" to require otherwise would be unworkable.  *Rose*, 361 F.3d at 796.

*Summum*, 555 U.S. at 480. But, again, *Summum* reaches beyond a formalistic one-size-fits-all rule for a more searching inquiry:

> A public park, over the years, can provide a soapbox for a very large number of orators—often, for all who want to speak—but it is hard to imagine how a public park could be opened up for the installation of permanent monuments by every person or group wishing to engage in that form of expression.

*Id.* at 479.[12]  Requiring viewpoint neutrality would defeat the purpose of Pleasant Grove's efforts.  Because the harm stemmed from the basic fact that two objects cannot occupy the same space at once, *Summum* explicitly limits the scope of its holding to the particular context of "the installation of permanent monuments of public property."  *Id.* at 480; *see also* Olree, *Identifying Government Speech*, 42 Conn. L. Rev. at 372 ("While clarifying the law with respect to certain monuments,

---

[12] *Summum* also distinguishes between permanent and temporary monuments in discussing the assimilative capacity of public parks.  555 U.S. at 480 ("Respondent compares the present case to . . . a request by a private group, the Ku Klux Klan, to erect a cross for a period of 16 days on public property that had been opened up for similar temporary displays, including a Christmas tree and a menorah. Although some public parks can accommodate and may be made generally available for temporary private displays, the same is rarely true for permanent monuments." (internal citations omitted)).  The Supreme Court makes plain how seriously it takes "the legitimate concern that the government speech doctrine not be used as a subterfuge for favoring certain private speakers over others based on viewpoint," *id.* at 473, by drawing a distinction based on the exceptionally polarizing symbol of a cross erected by the Ku Klux Klan.  *Id.* at 480.

however, the Court did not venture a method for identifying government speech in other circumstances.").[13]

### 3. This Court has not interpreted *Johanns* or *Summum* as establishing a one-factor control test applicable to every set of circumstances and incompatible with the *SCV* factors.

This Court "has continued to utilize the *SCV* factors to determine whether communication is government speech" since *Johanns*.    J.A. 128.    Instead of viewing the *SCV* factors and the more control-oriented approach as fundamentally incompatible, this Court has viewed them as distinct, yet complementary, approaches to different factual scenarios.    A brief review of these cases unquestionably establishes the ongoing vitality of the *SCV* factors subsequent to *Johanns*, while affirming their intentionally flexible application. *SCV*, 288 F.3d at 619 ("[W]e do not conclude that the factors . . . constitute an exhaustive or always-

---

[13] North Carolina's specialty license plate scheme still implicates private speech, even if this Court believes *Summum* governs and mandates a singular focus on control.    Pleasant Grove's action in *selecting* from privately donated monuments turned what may otherwise have been viewed as private speech into government speech.    *Summum*, 555 U.S. at 473.    By choosing and endorsing the messages conveyed by these monuments, the government adopted those messages as its own. *See id.* at 470-71 ("Just as government-commissioned and government-financed monuments speak for the government, so do privately financed and donated monuments that the government accepts and displays to the public on government land.").    Similarly here, by deliberately selecting, applying for, J.A. 71 ¶ 24, J.A. 72 ¶ 25, and paying extra for, N.C. Gen. Stat. 20-79.7(b), a specific specialty license plate, North Carolina drivers adopt the message on the plate as their own. The current controversy analogizes to the purchase of a bumper sticker: once purchased and placed on an automobile, its connection is to the vehicle owner, not the bumper sticker manufacturer.

31

applicable list."); *see also* J.A. 129 ("[D]ifferent factors will be relevant in different cases.").

In *Turner*, 534 F.3d at 354-55, this Court applied each *SCV* factor to conclude legislative prayer constituted government speech. As the District Court noted,

> [t]he unanimous decision in *Turner* was authored by retired Associate Justice Sandra Day O'Connor, who sat on the panel by designation. Notably, Justice O'Connor voted with the majority of justices in *Johanns*. 544 U.S. at 552. Her opinion in Turner does not suggest that *Johanns* articulated a new catch-all test for government speech; indeed, the opinion does not cite once to *Johanns*.

J.A. 89, n.6. Paralleling the current controversy, Justice O'Connor acknowledged the occasionally ambiguous features of speech. She specifically noted the difficulty in determining who bore "ultimate responsibility" for prayers delivered by individual legislators in a government setting. *Turner*, 534 F.3d at 355 (concluding the government was ultimately responsible despite the fact that "Turner and the other Council members take some personal responsibility for their Call to Order prayers."). Justice O'Connor's application of the *SCV* factors, without reference to *Johanns*, is powerful evidence this Court's case law squares with government speech jurisprudence more broadly.

In *Musgrave*, 553 F.3d at 298, this Court applied *SCV* factors to conclude West Virginia video lottery advertising constituted "hybrid speech" featuring

government and private elements.  Defendants sanitize *Musgrave*'s analysis as "mention[ing] the *SCV* factors, but only in passing and then only in the context of allegedly hybrid speech consisting of government speech and commercial speech of a third party."  Br. of Appellants at 35.  *Musgrave* does not merely "mention" *SCV* factors, but applies them in a context-sensitive fashion.  553 F.3d at 299 (referencing the program purpose prong in concluding "[o]n the one hand, the speech being restricted here is government speech because it falls within the scope of the video lottery program.  That program is one in which the state has a significant revenue interest . . .");  *id.* at 299 (noting "[m]oreover, the retailers are the ***literal speakers***") (emphasis added).  The application of the *SCV* factors comes almost immediately after a discussion of the holding in *Johanns*, clear evidence this Court finds no irreconcilable conflict.  *Id.* at 298-99.  The unanimous panel also distinguishes the case's facts from "*Summum v. Pleasant Grove City*, 483 F.3d 1044 (10th Cir. 2007), because the tension between the free speech clause and the establishment clause of the First Amendment is simply absent here."  *Musgrave*, 553 F.3d at 299 n.6.  *Musgrave* is not merely a discussion of "the Court's commercial speech doctrine," Br. of Appellants 36, but instead a direct rejoinder to the argument that *Johanns* and *Summum* constitute the whole of government speech jurisprudence as well as a robust embrace of the *SCV* factors, *Musgrave*, 553 F.3d at 298-99, and the conclusion in *Rose*.  *Musgrave*, 553 F.3d at 298 ("As

this court recognized in [*Rose*], some speech is "mixed" speech because it has aspects of both private speech and government speech.").

In *Page*, 531 F.3d at 281, this Court referenced the *SCV* factors before indicating *Johanns* distilled them into an analysis of government message establishment and control "in cases involving the government's use of third-party messages." The unanimous panel decisions in *Turner* and *Musgrave* make plain that this "distillation" applies only in very limited circumstances. "The factual underpinnings of *Page* are quite distinguishable from the instant controversy" such that *Page* "does not prohibit the consideration of other relevant factors" or a conclusion "that specialty plates can be hybrid speech." J.A. 130; *see also supra* pp. 18-20. Unlike the current controversy, in *Page* "the government did not create a program to encourage private speech." *Rosenberger*, 515 U.S. at 833. The school district in *Page* instead utilized its website and emails to convey a distinct government-developed, -endorsed, and –controlled message, namely, to oppose the Put Parents in Charge Act. 531 F.3d at 277-78. As in *Rust*, *Johanns*, and *Summum*, the government did not invite private messages into its forum; such an invitation would defeat the forum's purpose. *See id.* at 283. Accordingly, *Page* rightly follows *Johanns*. But, as discussed above, *supra* pp. 18-20, and illustrated by its own words as well as *Turner*, *Musgrave*, and the District Court, *Page* reflects a strand of the government speech jurisprudence, not its entirety.

4.    **The vast majority of sister circuits also have not interpreted** ***Johanns*** **or** ***Summum*** **as establishing a one-factor control test applicable to every set of circumstances and instead continue to apply the** *SCV* **factors in concluding specialty license plate implicate private speech.**

Sister circuits considering specialty license plates subsequent to the *Johanns* and *Summum* decisions have overwhelmingly continued to use the *SCV* factors to conclude that specialty license plates implicate private speech.  In so doing, they have either explicitly or implicitly rejected Defendants' argument that *Johanns* and *Summum* established a "catch-all test for government speech." J.A. 89, n.6.  These sister circuits have instead adhered to the context-sensitive approach that has characterized government speech jurisprudence.

In *Ariz. Life Coal.*, 515 F.3d at 968, the Ninth Circuit Court of Appeals applied the *SCV* factors in their determination "that the 'Choose Life' message displayed through a specialty license plate if issued by Arizona would constitute private speech."  Reviewing the jurisprudential developments, the Court noted "[p]rior to *Johanns*, the Fourth, Eighth, and Tenth circuit had adopted a nonexhaustive list of four factor to differentiate between" government and private speech.  *Id.* at 964.  The Court then noted the legally relevant factual distinctions between *Johanns* and specialty license plates:

> In *Johanns*, the individual harm was 'being forced to give the government money to pay for someone else's message.' In specialty license plate cases, private individuals choose to pay the price for obtaining a

35

> particular specialty license plate.  The First Amendment harm 'is being denied the opportunity to speak on the same terms as other private citizens within a government sponsored forum.'  Moreover, 'specialty plate programs are not part of a larger governmental scheme to encourage some private activity, like beef consumption.'

*Id.* (internal citations omitted).  *SCV* and *Johanns* were not incompatible, but instead addressed distinct "First Amendment harm[s]."  *Id.*  Accordingly, the Ninth Circuit adopted "***the Fourth Circuit's four-factor test—supported by the Supreme Court's decision in Johanns***" to determine if the "Choose Life" plates in question constituted government or private speech.  *Id.* at 965 (emphasis added).  Applying each of the *SCV* factors, the Court concluded the plates constituted private speech; Arizona's rejection of a "Choose Life" license plate was thus unconstitutional viewpoint discrimination.  *Id.* at 965-972.[14]

The Seventh Circuit similarly concluded the Supreme Court has not created an across-the-board one-factor control test, holding that "Choose Life" license plates implicate private speech pursuant to the *SCV* factors.  In *Choose Life*, the

---

[14] As noted above, *supra* p. 7, n.2, a "Choose Life" license plate is not per se unconstitutional.  The mischief here is "the State's offering of a 'Choose Life' plate in the absence of a pro-choice plate."  J.A. 132.  The mischief in Ariz. Life Coal., 515 F.3d at 972, was the rejection of a "Choose Life" plate "out of a fear that other groups would express opposing views," in other words, viewpoint discrimination.  *See also Rose*, 373 F.3d at 581 (Wilkinson, J., concurring in denial of rehearing en banc) ("The statute's message could be reversed and the plaintiffs' position could be pro-life, not pro-choice, but the principles that govern this case would remain the same.").

Seventh Circuit surveyed the pre- and post-*Johanns* government speech case law,

547 F.3d at 859-64, before finding similar legally relevant factual distinctions:

> [T]he First Amendment harm in the 'compelled speech' or 'compelled subsidy' context is the *compulsion*—in the former, being compelled against one's conscience to utter the government's preferred message, and in the latter, being compelled to subsidize someone else's private message.  The First Amendment harm in the specialty-plate context, on the other hand, is 'being denied the opportunity to speak on the same terms as other private citizens within a government sponsored forum.'

*Id.* at 862-63 (internal citation omitted).  The Court agreed "with the Fourth and

Ninth Circuit that there are enough elements of private speech here to rule out [a

determination of] government-speech" pursuant to the *SCV* factors.  *Id.* at 864.

After a similarly exhaustive of review of government speech jurisprudence

before and after *Johanns*, the Eighth Circuit joined with the Fourth, Seventh, and

Ninth Circuits in concluding the *SCV* factors were compatible with Supreme Court

case law.  *Roach*, 560 F.3d at 863-68.  *Roach*, the only post-*Summum* case on

point, easily distinguished *Summum* and directly stated that "the Supreme Court's

recent Summum decision [does not require] a different outcome."  *Id.* at 868 n.3.

> In [*Summum*], the Court held that privately-donated monuments in a city park communicate government speech.  We deal here with a much different issue: whether specialty license plates on privately-owned vehicles communicate government speech.  Unlike monuments displayed in public parks, specialty license plates that advertise the name or motto of a private

> organization facilitate expressive conduct on the part of
> the organization and its supporters, not the government.

*Id.* (internal citation omitted).  Accordingly, the Court applied the *SCV* factor to

conclude "Choose Life" plates implicate private speech.  *Id.* at 867-68.

The Ninth, Seventh, and Eighth Circuits have reviewed government speech

jurisprudence and arrived at the same conclusion as this Court: there is no one-

factor control test applicable regardless of the circumstances.  Instead, the *SCV*

multi-factor test remains good law applicable to specialty license plates.

**5.    Defendants' adoption of *Bredesen*'s novel "catch all" test
overlooks private speech elements specific to the State's specialty
license plate forum with dire potential consequences for First
Amendment liberties.**

Defendants lash themselves to the only judicial opinion ever to conclude

specialty license plates implicate only government speech, *Choose Life*, 547 F.3d

at 863 ("[T]he Sixth Circuit stands alone in holding that specialty license plates

implicate *no* private-speech rights at all."), in their effort to overcome the context-

sensitive government speech jurisprudence utilized by the Supreme Court and the

overwhelming majority of circuit courts.  In *Bredesen*, 441 F.3d at 380, a Sixth

Circuit panel concluded—over a strong dissent—that "*Johanns* set[] forth an

authoritative test for determining when speech may be attributed to the government

38

for First Amendment purposes."[15]  "The *Johanns* standard," they hold, "classifies the 'Choose Life' message as government speech."  *Bredesen*, 441 F.3d at 380.

The "one-size fits all single factor test," J.A. 128, *Bredesen* and Defendants adopt has been widely rejected in government speech jurisprudence as noted above.  *Supra* pp. 22-38.  The District Court noted the current controversy does not involve "a program like *Rust* or *Johanns* with an overarching [government] message to advocate or policy to enforce."  J.A. 126.  And *Rust* and *Summum* entailed venues wherein requiring viewpoint neutrality would either defeat their legislative purpose, *Rust*, 500 U.S. at 193, or lead "almost inexorably to the closing of the forum."  *Summum*, 555 U.S. at 480.  This is not so here.  Enabling private speech is at the core of the specialty license plate forum, J.A. 21 at ¶ 33, which has demonstrated the capacity to assimilate a large number of disparate messages.  *Id.*

---

[15] Judge Martin argues persuasively in dissent that "[t]he majority is mistaken . . . in reading *Johanns* as a watershed First Amendment case.  It may be a watershed *compelled subsidy* case, but it is not revolutionary and does not transform all First Amendment doctrine."  *Id.* at 387, n.12 (Martin, J., concurring in part and dissenting in part).  The dissent is so persuasive that both the Ninth and Seventh Circuits essentially adopt Judge Martin's analysis of why *Johanns* and specialty license plates present legally relevant factual distinctions.  *See Choose Life*, 547 F.3d at 863 ("We think Judge Martin has it exactly right."); *Ariz. Life Coal.*, 515 F.3d at 964 ("As noted by Judge Martin in his dissenting opinion in *Bredesen*, *Johanns* is factually distinguishable from these specialty license plate cases.").  In fact, it is unclear whether *Bredesen* is even controlling in Sixth Circuit.  *See Grosjean v. Bommarito*, 302 F. App'x 430, 436 (6th Cir. 2008) (citing *Bredesen* favorably but noting that "[t]he two factors identified in *Johanns* were not . . . held to be exhaustive" and suggesting another relevant factor might be "whether the speech is attributed to a particular private actor.").

at 127 n.4. Finally, looking only at the level of governmental control generally, and in situations in which the government has "encourage[d] a diversity of views from private speakers," *Rosenberger*, 515 U.S. at 834, adopting Defendants' proposed change wreaks havoc on First Amendment liberties.

      **a.**   **North Carolina "Choose Life" license plates are distinct from *Rust* and *Johanns* in that the State in the current controversy is not advocating an overarching government policy or message.**

*Rust* and its successor *Johanns* do not govern North Carolina's "Choose Life" license plates because, *inter alia*, there is no overarching government policy or message involved in the current controversy. Government speech escapes Free Speech Clause scrutiny because the government "may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted." *Rosenberger*, 515 U.S. at 833. The government accordingly was within its rights to fund only its "family planning" without "abortion" message through its Title X program. *Rust*, 500 U.S. at 178. Similarly, the government could compel funding for its "Beef. It's What's for Dinner," promotional campaign in *Johanns*. 544 U.S. at 554. But this exemption from scrutiny is not limitless; "the government speech doctrine [must] not be used as a subterfuge for favoring certain private speakers over others based on viewpoint." *Summum*, 555 U.S. at 473. The nature, operation, and breadth of messages in North Carolina's specialty license plate forum distinguish the current controversy from *Rust* and *Johanns*.

This forum constitutes "a government-sponsored avenue to encourage private speech," J.A. 132, as the State has made plain. The DMV does not encourage individual drivers to join "the State in spreading the State's 'message;'" they are "encouraged to show off their own special interest by purchasing a 'special interest' license plate." *Id.* Legislative supporter Representative Tim Moore depicted the current controversy not as "motorists consent[ing] to carry[] the government's message," Br. of Appellants at 11, but instead "voluntary ***speech that people are making*** by purchasing the license plate." J.A. 21 at ¶ 33 (emphasis added); *see also supra* pp. 3-4. Individuals are plainly availing themselves of a novel means of communicating their messages through the government, not vice versa.

The operation of the license plate forum underlines that the government is not conveying its message through the specialty license plate program. It requires a fee for the vast majority of its specialty license plates, N.C. Gen. Stat. § 20-79.7(a)-(b), including $25.00 for the "Choose Life" plate. N.C. Gen. Stat. § 20-79.7(b). But, even upon receipt of individuals' payment, the government does not turn over the message it now claims to its "volunteer disseminator[]." *Bredesen*, 441 F.3d at 378. North Carolina only acts to create many of its specialty license plates, N.C. Gen. Stat. § 20.81.12, including "Choose Life," after it has received 300 paid applications. N.C. Gen. Stat. § 20.81.12(b84). "If the General Assembly

intends to speak, it is curious that it requires the guaranteed collection of a designated amount of money from private persons before its 'speech' is triggered." *SCV*, 288 F.3d at 620.  Such an approach inverts the means *Rust* and *Johanns* employed to disseminate the government's message.

Finally, the sheer number of specialty license plates available, as well as the fact that many are not germane to—or actively dissonant with—any governmental interest, belies the notion that North Carolina has set an "overarching message" through its specialty license program.  *Johanns*, 544 U.S. at 561.  The "Choose Life" license plate was authorized along with dozens of others, J.A. 71 ¶ 19, bringing the overall total to more than 200.  N.C. Gen. Stat. § 20-79.4(b).  Such volume does not lend itself to an easily distilled government message akin to "family planning" without "abortion," *Rust*, 500 U.S. at 178, or "Beef.  It's What's for Dinner."  *Johanns*, 544 U.S. at 554.  Many of these over 200 plates are easy to comport with a private interest, but far more difficult to connect to any governmental interest, let alone message—for example, license plates displaying the insignia of out-state colleges and universities that rival North Carolina institutions of higher learning academically and athletically, J.A. 81 n.3, the "Corvette Club," N.C. Gen. Stat. § 20-79.4(b)(55), and the "Buddy Pelletier Surfing Foundation."  N.C. Gen. Stat. § 20-79.4(b)(31).  Several specialty license plates are actively dissonant with any message from the State, such as "Don't

Tread on Me," N.C. Gen. Stat. § 20-79.4(b)(65) and civic club plates from the Knights of Columbus and the Sons of Confederate Veterans. *See* DMV, *Civic Clubs Plates*, https://edmv-sp.dot.state.nc.us/sp/SpecialPlatesList?category=civic (last visited March 21, 2013). North Carolina warning against governmental oppression ("Don't Tread on Me") is bizarre. North Carolina expressing the message of an organization, the Knights of Columbus, "which requires members to be practicing Catholics," *Roach*, 560 F.3d at 868, raises yet more constitutional issues. North Carolina claiming the message of a Confederate flag emblem, which many of our state's residents "view to be a symbol of racism and slavery," *Rose*, 361 F.3d at 801,[16] is nonsense. Aggregating these disparate messages into an "overarching message" is a hopeless enterprise.[17]

---

[16] In fairness, many of our state's residents view the Confederate flag as "a symbolic acknowledgment of pride in Southern heritage and ideals of independence." *SCV*, 288 F.3d at 624. These differing interpretations of the Confederate flag speak to its controversial nature, further borne out by the fact that Virginia tried to restrict the use of the Confederate flag logo on its specialty license plates. *Id.* at 613. "It is a nice academic exercise to hypothesize that the license plate program is a government program to disseminate through private volunteers all of the state's various messages," *Bredesen*, 441 F.3d at 382 n.4 (Martin, J., concurring in part and dissenting in part), but arguing North Carolina actually intends the Confederate flag as its message defies common sense.

[17] Defendants make much of *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 569-70 (1995), and its admonition that some inconsistency in one's messages does not strip a private speaker of First Amendment protections, and argue that the same rule should apply to the government. Br. of Appellants at 8. However, this argument begs the key question. What is at issue is not whether the government can offer a message that is less than perfectly consistent—it is whether the government is the speaker at all.

Yet, attempting to square its forum with *Rust* and *Johanns*, Defendants argue "[b]y approving many different plates, North Carolina sends a message about the things that make it unique and special—from the diversity of its citizen's interests and their educational backgrounds to the causes that the State supports."  Br. of Appellants at 18; *see also Bredesen*, 441 F.3d at 376 ("[T]here is nothing implausible about the notion that Tennessee would use its license plate program to convey messages regarding over one hundred groups, ideologies, activities, and colleges.  Government in this age is large and involved in practically every aspect of life.").  As the District Court notes, this is a "stretch."  J.A. 126.  First, there is a fine line indeed between a governmental message celebrating "the diversity of its citizen's interests," Br. of Appellants at 18, and private speech.   Second, the purported celebratory message is an undocumented post hoc rationalization.  North Carolina does not encourage individual drivers to join "the State in spreading the State's 'message;'" they are instead "specifically encouraged to show off their own special interest by purchasing a 'special interest' license plate."  J.A. 132.  Third, Defendants disavow the nebulous asserted message of celebrating "the diversity of its citizen's interests" mere pages after they present it.  On the one hand, the State

---

Such a finding, pursuant to the four-factor test from *SCV*, requires that the government act according to some overarching purpose.  *See* 288 F.3d at 618. Here, there is clearly none.

uses this theme in its effort to lasso Purdue,[18] J.A. 81 n.3, "Corvette Club," N.C. Gen. Stat. § 20-79.4(b)(55), and the Sons of Confederate Veterans specialty license plates into a coherent message. On the other hand, the State then presents a parade of horribles in the form of objectionable license plates should "the diversity of its citizen's interests," Br. of Appellants at 26, run wild without governmental supervision. *Id.* at 28-29 (arguing viewpoint neutrality could lead to specialty license plates advocating "Kill the Sea Turtles"). The only coherent way to view the specialty license plate forum is as a warts and all expression of North Carolinians' speech.

The current controversy is distinguishable from *Rust* and *Johanns* as North Carolina conveys no overarching message through its specialty license plate program warranting the protection of the government speech doctrine. The State has stressed repeatedly and in multiple venues that this was a forum for private special interests. Furthermore, the forum's operation as well as the volume and breadth of the specialty license plates therein are compatible with private, not

---

[18] "The state did not wake up one day and decide people needed to support Auburn; rather, Auburn supporters petitioned the state for permission to fundraise and express themselves on state property, for a fee—which makes it extremely unnatural, and unrealistic to view the tag as a state-message to all of us." Olree, Specialty License Plates: Look Who's Talking in the Sixth Circuit, 68 Ala. Law. at 214 (criticizing *Bredesen*'s conclusion that Auburn specialty license plates constituted government speech by Tennessee). No more did North Carolina wake up and decide people should support *Purdue*, which is located in Indiana and does not even play in the Atlantic Coast Conference.

government, speech.  North Carolina has sent the message loud and clear: it has not sent a message through its specialty license plates.

### b.    The North Carolina specialty license plate forum is distinct from *Rust* and *Summum* in that its intent and history indicate the desire and ability to assimilate a large number of private messages.

*Rust* and *Summum* do not govern North Carolina's specialty license plate program due to the pivotal factual distinction that the current controversy involves a forum capable of assimilating private speech compatible with its purpose.  The statutory regime at the center of *Rust*, 500 U.S. at 193, and the public monument park in *Summum*, 555 U.S. at 465, explicitly limit and cannot function as intended given unfettered private access.  In *Rust*, requiring viewpoint neutrality on the issue of abortion would have defeated the legislative purpose of selectively funding the "family planning" without "abortion" message.  *Rust*, 500 U.S. at 178.  In *Summum*, 555 U.S. at 480, requiring viewpoint neutrality would "lead almost inexorably to the closing of the forum."  A 2.5-acre public park "can accommodate only a limited number of permanent monuments."  *Id.* at 478; *see also id.* at 480.

The intent and assimilative capacity of North Carolina specialty license plate forum is worlds apart from the venues involved in *Rust* and *Summum*.  By encouraging residents to "***promote themselves and/or their causes***," DMV, *Specialized                 License                 Plates*,                 https://edmv-sp.dot.state.nc.us/sp/SpecialPlates?serviceType=EXP&fM=Y   (last   viewed   on

March 21, 2013) (emphasis added), the State has "encourage[d] a diversity of views from private speakers." *Rosenberger*, 515 U.S. at 834.  Encouraging private expression implies a broad assimilative capacity, which is borne out by the huge number and breadth of North Carolina specialty license plates. *Supra* pp. 42-43. More broadly, the flexible nature of a specialty license plate forum, *Bredesen*, 441 F.3d at 384, n.6 (Martin, J., concurring in part and dissenting in part) (noting Maryland, for example, "has approximately 500 different specialty license plates"), resembles a public park's ability to "provide a soapbox for a very large number of orators—often for all who want to speak" more than its inability to "be opened up for the installation of permanent monuments by every person or group wishing to engage in that form of expression." *Summum*, 555 U.S. at 479.

Defendants claim otherwise, arguing that viewpoint neutrality would result in North Carolina having "to shut down its specialty license plate program," Br. of Appellants at 38.  Echoing the *Bredesen* majority, the State presents "melodramatic doomsday predictions" about what will come to pass in a viewpoint neutral specialty license plate forum.  441 F.3d at 390 (Martin, J., concurring in part and dissenting in part).   Specifically, Defendants raise the specter of North Carolina having to offer a "Kill the Sea Turtles" alternative to its "Save the Sea Turtles Plate."  Br. of Appellants at 28.  "[A] page of history is worth a volume of logic" when it comes to such hypotheticals.  *N.Y. Trust Co. v. Eisner*, 256 U.S. 345, 349

(1921) (Holmes, J.).   The State presents no evidence North Carolinians have petitioned for a "Kill the Sea Turtles" plate.   It is possible North Carolinians simply do not have a fervent enough special interest in "Kill[ing] the Sea Turtles" to apply and pay for this specialty license plate.   In all likelihood, North Carolina's viewpoint-neutral 300 application trigger saves state government from inundation "with frivolous license plate proposals."   *Bredesen*, 441 F.3d at 391 (Martin, J., concurring in part and dissenting in part).

Regardless of how North Carolina has avoided "Kill the Sea Turtles," fanciful license plate predictions distract from the aforementioned perversities inherent in arguing that the specialty license plate forum constitutes government speech.   First, while conjuring divisive specialty license plates that will not appear on North Carolina roads, Br. of Appellants at 28-29, the State ignores the fact that the forum for which it now claims sole responsibility already hosts polarizing messages it cannot mean to embrace. *See* DMV, *Civic Clubs Plates*, https://edmv-sp.dot.state.nc.us/sp/SpecialPlatesList?category=civic (last visited March 21, 2013) (noting the availability of a Sons of Confederate Veterans specialty license plate bearing a Confederate flag).   Second, the "Kill the Sea Turtles" canard is intellectually inconsistent.   Arguing the message behind its forum is a celebration of "diversity of its citizen's interests," Br. of Appellants at 18, pages before asserting the ensuing anarchy from said unsupervised diversity would require

North Carolina "to shut down its specialty license plate program," *id.* at 30, is untenably ironic. In short, "Kill the Sea Turtles" gives North Carolinians too little credit. Our state's specialty license plates, whether whimsical, N.C. Gen. Stat. § 20-79.4(b)(184) (offering a specialty license plate stating "***I'd*** Rather Be Shaggin'") (emphasis added), or serious, N.C. Gen. Stat. § 20-79.4(b)(12) ("The plate may bear a picture of a dog and cat and the phrase '***I*** care.'") (emphasis added), reflect the real passions of our residents. Plaintiffs' commitment to reproductive choice animates their desire for a "Respect Choice" license plate; it is unfortunate Defendants put it on the same level as "Kill the Sea Turtles."

North Carolina's specialty license plate forum operates from the intent and with the capacity to assimilate numerous, disparate private interests. Though actual divisive messages have made their way onto specialty license plates, the State has not presented evidence these divisive messages have imperiled the forum. Viewpoint neutrality in the current controversy would not lead "inexorably to the closing of the forum," *Summum*, 555 U.S. at 480, because specialty license plate forums are intended to, and capable of, accommodating private messages in a way the venues in *Rust* and *Summum* were not and could not, respectively.

   c.   **Defendants' "catch all" test for government speech is inconsistent with and would seriously undermine First Amendment liberties long taken for granted.**

A one-factor control test for government speech applied in every circumstance would turn First Amendment jurisprudence on its head, producing myriad perverse results generally, and in the context of specialty license plates specifically. Defendants proposed exclusive "focus on the level of control the government exercises over speech," Br. of Appellants at 7, could produce different outcomes in seminal First Amendment cases. *Bredesen*, 441 F.3d at 386-87 (Martin, J., concurring in part and dissenting in part). For example, *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624 (1943), prohibited a state from requiring schoolchildren to recite the Pledge of Allegiance while saluting the American flag. Pursuant to a control test, however, "[t]he Pledge of Allegiance is the government's message" and its forced recitation would implicate no private interest. *Bredesen*, 441 F.3d at 386-87 (Martin, J., concurring in part and dissenting in part). Similarly,

> [i]f absolutely any speech becomes government speech just because the government gives itself the power to veto the final wording in advance, then the government can safely begin reviewing in advance the 'final wording' of absolutely any speech, silencing any prospective public speaker with whom it disagrees.

Olree, *Specialty License Plates: Look Who's Talking in the Sixth Circuit*, 68 Ala. Law. at 214; *see also SCV*, 305 F.3d 241, 246 (Luttig, J., respecting the denial of rehearing en banc) (limiting government speech test to review of ownership and control "would mean that even speech by private individuals in traditional public

50

fora is government speech").  If the government's control of the forum makes viewpoint discrimination permissible, then North Carolina could have issued "Obama 2008" and "Romney 2012" specialty license plates without countervailing alternatives.  *Rose*, 373 F.3d at 581 (Wilkinson, J., concurring in the denial of rehearing en banc) ("The state is saying that its citizens may express one view on a profound controversy but not the other . . . . This is a presidential election year. May a state issue plates touting one candidate, but not another?")

   "No one, upon careful consideration, would contend that, simply because the government owns and controls the forum, all speech that takes place in that forum is necessarily and exclusively government speech." *SCV*, 305 F.3d 241, 246 (Luttig, J., respecting the denial of rehearing en banc).  After all, the First Amendment does not brook compelling schoolchildren to recite the Pledge, *Barnette*, 319 U.S. 624, "prior restraint[s] or censorship," Olree, *Identifying Government Speech*, 42 Conn. L. Rev. at 385-86, or specialty license plates "touting one candidate, but not another." *Rose*, 373 F.3d at 581 (Wilkinson, J., concurring in the denial of rehearing en banc).  Yet this is the crux of Defendants' argument rationalizing "Choose Life" license plates without a countervailing alternative.   The First Amendment's history and the liberties it has secured argue persuasively against such a "catch all" approach.  J.A. 89, n.6.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that this Court affirm the decision of the District Court.

## REQUEST FOR ORAL ARGUMENT

Plaintiffs respectfully request an opportunity for oral argument in this case. Because this case involves a significant dispute regarding the interpretation of the First Amendment to the United States Constitution, Plaintiffs believe that oral argument would be beneficial to this Court.

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)</u>

Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:**  Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply brief may not exceed 14,000 words or 1,300 lines.  Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines.  Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines.  Counsel may rely on the word or line count of the word processing program used to prepare the document.  The word-processing program must be set to include footnotes in the count.  Line count is used only with monospaced type.

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

> X      this brief contains 13,125 words, excluding the part of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

> this brief uses a monospaced typeface and contains [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:**  A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger.  A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10 ½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> **X**      this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman for the text and 12-point Times New Roman for the footnotes; or

> this brief has been prepared in a monospaced typeface using [*identify word processing program*] in [*identify font size and type style*].

> /s/ Christopher A. Brook
> *Counsel for Plaintiffs-Appellees*
> March 21, 2013

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, I electronically filed the foregoing BRIEF FOR PLAINTIFFS-APPELLEES with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

> Neil Dalton
> Special Deputy Attorney General
> Kathryne E. Hathcock
> Assistant Attorney General
> Post Office Box 629
> Raleigh, NC 27602-0629

This the 21st day of March, 2012.

> <u>/s/ Christopher A. Brook</u>
> Christopher A. Brook
> *Counsel for Plaintiffs-Appellees*